As discussed in Ms. Rykova's briefs, there are three main points that compel reversal of the administrative order denying her petition for her application for asylum and withholding of removal to her native Belarus. I will address each of these issues in a summary fashion and then return to them each in detail as my time and the Court's questions permit. Point one, this Court has jurisdiction to consider Ms. Rykova's challenge to the adverse credibility determination. Point two, review of that adverse credibility determination shows that it was based upon improper considerations and must be reversed. And point three, if Rykova's unrebutted testimony is considered and taken as true, as it must be if the adverse credibility finding fails, it shows that she was subject to past political persecution on account of her membership in the Belarusian National Front. Not much. We're probably going to say the same thing. Yeah, you might as well skip over one and two and go to three because that's the meat of the coconut for you. I mean, you know, it wasn't too good for her. But, you know, she stayed on police station for a day. But at least she wasn't beaten. She wasn't she wasn't even imprisoned in any sense. I mean, she wasn't there overnight. She lost her job, but that's never been enough to amount to persecution. This isn't very much that much, you know, even if we take her words for everything. Okay. Well, a few points on that, Your Honors. First, I'd like to point out that the Attorney General doesn't challenge this point. Her brief, his brief, excuse me, focuses exclusively on the fact that Ms. Rykova did not have jurisdiction. Do you want to address the point? Sure. Now, on the merits, you point out that you say it's not much. The police searched her home, confiscated political materials, the detained her at the anti-government activities. They threatened her with arrest, thrown her in jail. Somebody killed her son. Does that count? I think that's something for this Court to consider. If you look at this Court's decision in Aguilera-Cota, for example, that was a situation fairly similar to Ms. Rykova's, where she was, where the petition in that case was threatened by guerrillas. It was actually kind of reverse what's going on here. Isn't it a story that he was a bodyguard for somebody, and then, you know, doing his job as a bodyguard? Yeah. He got knocked off? Exactly. That's hardly persecution. Well, I think that... I mean, he was in a dangerous profession. I mean, bodyguards get killed in this country, too. I think the problem here, Your Honor, is the fact that there's an implication that the government was involved with that killing. The fact that... She doesn't say anything like that. I think she says exactly that. She says that she knows that, you know, some big organization killed her, her son-in-law, because he was working for the Belarusian National Front. But he never told her who he was working for, did he? Oh, he did. She... He told her explicitly that he was doing work for the Front. She testified to that fact. The bodyguard work? Yes. Where is that in the record? Sure. Um, you can find that at... Do you want to look further up and tell us on rebuttal? Sure. Let me get up again. Thank you. Thank you. There's one problem I have, perhaps. The I.J. said, well, if I credited her testimony, then that might be persecution. But he never really made a ruling on it. And under... Are we entitled to make rulings about whether or not this amounted to persecution when the I.J. and the B.I. never did? Wouldn't we just... If we were willing to overturn the adverse credibility finding, wouldn't we just have to send it back for them to decide these questions? I think there are two ways this Court can handle it. First, if you conclude that the I.J. and B.I. did not address that issue, you can remand the case back to the B.I.A. So the B.I.A. can consider the persecution issue if you think that they decided incorrectly, as we proffer, regarding the adverse credibility finding. Alternatively, I think this Court can find that the B.I.A. and I.J. actually considered that issue on its merits. While the B.I.A. said, you know, if we considered her testimony credible, this amount of persecution, it said that doesn't really matter because we think the fact that she said her husband still lives in this apartment negates that fact. Even if she was being persecuted, it's not a well-founded fear of future persecution. The problem with that is that she never testified to that effect. While the government kept on pushing her to say, you know, doesn't your husband still live there? She kept on saying, I don't know, I don't know, I don't know. And finally, what she said is, well, I know that his registration is Pokiska and the system in Belarus. Well, what you're saying is you think the B.I.A. implicitly addressed it. Exactly. Must have addressed it. Exactly. So in response to Ms. Canvey's question is, yes, we can affirm or deny the petition based on if we determined that there was no persecution. Exactly, Your Honor. Now, back to your point about the son-in-law's murder, I think that, you know, hopefully I'll be able to find that site where she does actually say he was working for the Belarusian Front. She said something to the fact that he was working for the Front. But you must also find a site that says that he, that the government did him in. Well, I think that it has, I mean, there's no express testimony to that fact. I would concede that point. She never says the government. Could have been a rival political party. Could have been somebody who has it in for whose upper body he was guarding for personal reasons. No. Could have been somebody. I mean, people in politics often have tumultuous personal and financial lives, too, right? So we don't know who killed him. I think there are various inferences that can be drawn, Your Honor. Certainly there's no implication that if you don't serve as a bodyguard that you're going to get killed. No, I think that's correct, Your Honor. I don't think there's anything in the record suggesting she's going to go back and be a bodyguard, is she? No, of course not. But I think that that's only one of the many incidents that she described. And that's actually a collateral incident involving a third party, which may show that even though she hasn't been attacked yet, in the future it may get to that point. If she takes a bodyguarding position. All right. Like you said, we don't really know what aspect of his involvement led to his murder or if it necessarily was his involvement. But it's her burden. And if we don't know, that counts against her. Well, like I said before, Your Honor, I think this is just one fact. And I think that the Court should look at this more like the third party murders in Aguilar Acota, where the Petitioner laid out incidences that affected him personally. And so in addition to that, I have these two family members who were killed. One, he just said, you know, he was killed around the time that Archbishop Romero was killed in Central America. And in addition to that, I had a niece who was shot outside my house in a firefight. But the Petitioner didn't say anything more than that. He just offered that as evidence of the violent conditions that may be affecting him in the future. I think what this Court really needs to focus on is the, you know, four-ish incidences that affected her directly, namely that the police searched her home, they detained her, interrogated her, threatened her, which I think is an important one, with arrest and sending her to an orphanage, subjected her to surveillance. And I think the big one is that she was fired from her job. Justice Kaczynski, you said that, you know, the fact that you're fired from your job cannot by itself establish persecution. But I think this Court's decision in the DALA, B-A-B-A-L-L-A-H, the Ashcroft says just the opposite. There, the Court found that economic persecution by itself can amount to persecution. Just losing your job? Well, I think she showed more than she just lost her job. I think what she said in this case was, she said that the government forced her out of her job. And she did testify directly to that effect on page 119 of the administrative record. And she said, as a result of that, not only could she not work as a school teacher there, she couldn't work as a school teacher anywhere. She was blacklisted, basically. And she said from the time that she was fired until the time she left Belarus, which was about, I think, six or seven months, she wasn't able to find any kind of employment. So I think that, you know, it's not just the fact that, you know, maybe she was subjected to some harassing by the police, but they targeted her economically in such a way that her life and liberty really was threatened. I'll reserve that for a quick rebuttal. Thank you. Okay. We'll hear from the government. Good morning, Your Honors. Patricia Corrales-Talleda appearing for the Respondent, Mr. Gonzalez. On the issue of the exhaustion, I don't know if the Court wants to hear that, but it is the government's position that on the adverse credibility issue, the Court does not have jurisdiction to entertain that issue. So it's hard for you to sustain that. Well, perhaps you lose on that. You didn't argue the merits at all. Have you forfeited that? Your Honor, that is correct, that we didn't argue the merits of the adverse credibility in our briefs. And that is because it is our position that this Court lacks jurisdiction. Now, the Board commented... I think they're unthinkable. Assume you're going to lose on that. What happens next? Well, then what happens next, Judge, is that we believe that the immigration judge's decision on the adverse credibility is sustainable, in that given the substantial evidence in this case, the immigration judge's findings... Assuming we lose on that, too. Assuming we lose on that as well, then our record stands that the Respondent in this case did not meet her burden of proof in showing that she suffered past persecution or that there's a likely... You didn't argue that in your brief. You didn't argue even the sustaining the IJ's credibility finding in your brief. No, Your Honor. Have you forfeited those issues? We don't believe we forfeited those issues, Your Honor. We indicated in our brief... Why not? I mean, you stood your ground on one argument. We can spend the next 10 minutes talking about it, but you're going to lose on that, on the exhaustion point. I can just predict that. I believe in the reply brief, Your Honor, when the supplemental brief was requested by this Court, I believe our reply brief to that supplemental brief addressed the issue of whether or not the... Assuming the Court would find jurisdiction in this case, that the immigration judge's position or decision in this case was still sustainable in that the immigration judge made a proper finding that the Respondent's credibility was not... Was questionable, was not credible, her testimony, her story. And I believe because we made a slight alternative argument in our response brief to the supplemental briefing by Respondent's counsel, we've preserved our ability to argue it. This is a second rep brief? I believe so, Your Honor. This has been so small, I missed it. I'll take a look. Okay, go ahead. Thank you. In this case, in addressing the Court's concerns regarding the questions that you posed to Respondent's counsel, let me just address that we don't believe that the Respondent in this case suffered past persecution, as the Court noted, or is likely to suffer a well-founded fear of future persecution. As the Court well noted, there is no evidence in the record that the son-in-law, this is not her son, but a son-in-law, was involved in the BNF, if you will. And all we know is that she had an understanding that he was a bodyguard. It's clear that the record shows that this individual was murdered. He was a victim of a robbery. The investigation took two years. She testified that there was articles about it, there was a two-year investigation surrounding the murder of her son-in-law, and that the conclusion of it was that he was wrong, that he was. You know, I'm having trouble seeing how that either the IJ or the BIA ever reached the question of whether her testimony, if believed, would amount to persecution. I mean, the IJ says, you know, perhaps all these things she said might amount to might have risen to the level of persecution, but because the Court does not find the respondent credible, it need not reach that decision. So everything, it seems to me, depends on the credibility defamation, not an argument that, well, if she's credible, it didn't amount to persecution. Then the Board simply affirms the adverse credibility finding. It never gets to the question of whether what she testified to would have amounted to persecution. And it seems to me, I just wonder whether we're entitled to make that an answer. That's a very good question that you ask. I don't believe that this Court is entitled to do that. I think the Court should remand it back to the Board of Immigration Appeals to make a proper finding in relationship to the credibility. But in saying that, I don't think that a finding as to credibility was made. I don't believe the Board made any finding as to credibility. I don't think the Board made any finding as to credibility. Well, of course it did. It just says, it says, in particular, we agree with the immigration judge's testimony that much of the Respondent's testimony was implausible. Implausible is such a nebulous word, Your Honor. I would stand to argue here that the Board simply commented on that. It never made a finding that the Respondent was incredible. It never made a finding that she was credible. It simply commented on it. Just simply because the Board commented, it doesn't mean that it reached the issue of credibility. I don't believe the Board did, because the Board even noted in its decision The IJ certainly did. The IJ did, Your Honor. And the Board indicated that the So the Board either did or didn't. The Board The Board says we find no reason to disturb the immigration judge's finding in this regard. The appeal will be dismissed. And the only thing it talks about is the credibility. I believe that, well, that is true, that the Board said that in those terms. But the Board also went on to say that because the Respondent never addressed the adverse credibility in her brief to the Board, that it wasn't going to, if you will, discuss it or analyze it. Kennedy I wasn't going to disturb, is what it said. We're not going to disturb the IJ's findings. Now, if the Court, you know, understanding the Court's concerns, assuming that the Board has addressed the credibility issue in that very small sentence, in a very short sentence, indicating that the comment that it made, that the Board has addressed it or not, it either addressed it, in which case we're reviewing the Board's findings, or it didn't address it, in which case we review the IJ's credibility finding, which then punches through. So either it did address it or it didn't address it. Either way, somebody made a credibility finding. You are still arguing an exhaustion argument, which you're saying can't reach it. But if we do reach it, there's no doubt that there was a credibility finding made by somebody below. That is correct, Judge. And it's either the IJ, if the BIA said nothing about it, then we'll look at what the IJ did, right? That's correct. Okay. So if the IJ, if you're right and the BIA said nothing about it, which I think you're not right, but if you are right, then we just look at the IJ's credibility finding. Or if you are not right, the BIA did address it, in which case we address the BIA's findings. Well, either way, if we look at the credibility finding, I think the credibility finding in this case that the immigration judge made is sustainable. I mean, the judge's findings were specific and cogent, and she gave particular reasons why the Respondent was not credible in this case. In particular, the immigration judge in this matter focused on the fact that the son-in-law's there was no indication that the son-in-law's death was related or had any relationship to her involvement in the BNF, that there was just why would that go to credibility? Well, it goes to credibility in that here's a woman who says that her father here's a Respondent who indicated that her son-in-law was murdered as a result of his involvement or her ex-husband's forcing him to be involved in the BNF, yet she couldn't come up with any information relating to his involvement in the BNF. She couldn't say something like that. Well, you know, he says things like, gee, a murder like that would be reported in the newspapers. And, of course, her theory is that it was the government that did him in. And probably in Belarus, when the government does something like that, it doesn't get splashed all over the newspapers. The immigration judge found it incredible that after a two-year investigation that there was no reporting of this investigation or the murder. That is correct. And, in fact, also hinging on that or, if you will, as part of her finding in relationship to that specific issue was the fact that the Respondent testified that when she left Chicago to live with her friend, who was a witness in this case, who testified on her behalf, she told this individual that she was living with for over three months. He came in to testify. He had no knowledge about this son-in-law's death or really what was the happenings or the specifics surrounding that death. And yet here's a woman who told this same individual, this same individual who came in to testify on her behalf, about a very intimate detail about concerning her daughter's rape. Yet she wouldn't tell him about what happened to her or her son-in-law in Belarus. It just didn't make sense. And that's one of the reasons that the immigration judge … He knew about it. He just didn't know a lot of details about it. His testimony was that, I don't want to get involved. I don't want to know anything about politics. I don't like the man. And the immigration judge found that that was – it wasn't reasonable. It wasn't reasonable. Here's an individual who's been living with the Respondent for three months. She shares a very intimate detail about her daughter's rape, but she won't share with him the very specifics of it. I think he's interested in raping. He's not interested in Belarus politics. I can see that. I mean, the rape is sort of a personal tragedy that happened here in this country very recently, and he wants to say, well, you know, stuff going on in the old country. I don't want to hear about it. It would be a problem if people don't want to hear about what's going on in the old country. But if this is an – if the Respondent shared and shared all these … But what he said is he's not interested in hearing about it. I mean, she may want to share all she wants. If he says, I don't want to hear what's going on, you know, politics in the old country, just – I don't want to hear about it. Well, she can – I don't see what the problem is with – I mean, where the inconsistency is. He says, yeah, you know, if your daughter got raped here in Chicago, you know, that's a story that interests me. But politics in Belarus, you know, old country, no, I don't have any interest in that. And the daughter's rape in Chicago is why she moved in with this friend in Los Angeles. It seems to me that's the first thing that would be said. Why are you out here on my doorstep? Well, I had to leave my fiancé. He raped my daughter. That's true. And then, Ayaan, that is correct. But why not tell the same person that – who's coming to testify on your behalf to support your story? All the stuff – all the things, all the incidences, all the tragedies that you suffered in Belarus. She didn't do that. It's pretty fun. Pretty fun. But that wasn't the only basis for which the immigration judge found the Respondent incredible. The immigration judge – Put enough wafers together, you'll get something. The immigration judge in this case also, Your Honor, with all due respect, found that the Respondent's testimony differed from the information that she, you know, indicated on her asylum application. In particular, here's – her story just doesn't make sense. Here's a woman, Your Honor, who's been divorced from her ex-husband since 1984. She testifies that she's forced to live with him. She testifies that he forces her to join the BNF, but she can't produce the – the membership card or the application or anything like that. This is the same woman who testifies that when the police came to search her apartment because they were interested – I'm sorry. What's the – what's incredible about any of that? Well, Your Honor, it just – it doesn't make sense. If I can just relate to one point relating that. What doesn't make sense? I mean, just so far. The part that she's forced to live with him. It doesn't make sense that she's forced to live in – with her – with her ex-husband. He's – she's been divorced from him since 1984, and yet she's forced to live in this apartment with him. Why does it – why does it make sense? Your Honor, the immigration judge didn't – the immigration judge in this case just didn't think that that would make – Obviously, that's not what lived in Eastern Europe on the communism. That's – that is correct. Obviously, that's the BIA – that immigration judge needs to go there. If I – Let me point out one other, if you will, one other incident that she described that it doesn't make sense. It's just not plausible, and that is she testified that because of her husband's, if you will, involvement in the BNF, the police came to search their apartment. There was a – this was a communal apartment of sorts. Everybody had their own room, if you will. I remember. I used to live in one of those. And the police in this instance came to search her – her specific room. They wanted to search the husband's room, but they did nothing. If they were so interested in the husband, why not knock down the door, even though it was closed? Why not search the other rooms to see whether or not there was any other anti-government, you know, paraphernalia there or – or pants or anything like that? They didn't. They only searched her room. And yet, they didn't come back to search the husband's room, which is what the reason they were there for in the first instance. The immigration judge in this case thought that just didn't make sense, that that didn't add up. And that was one of the very – one of the very specific reasons that the immigration judge in this case did not find the Respondent credible, along with other reasons relating to her. Your time is up. Thank you, Your Honor. We'll give you a minute for a button. Do you have that citation for your grounds? I do, Your Honor. At page 112 of the administrative record, Rykova testified, quote, I know that my late son-in-law was also involved. At least I know that he provided certain services to the family.       I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry.           I'm sorry. I'm sorry. I'm sorry. I'm sorry. Your Honor, I'm sorry. This is my – I don't have the administrative record right here. I can grab it for you. This would be lines 6 through 11 of page 112. You know, besides him, I was also a member. But later on, all these problems started. Now I know that my late son-in-law was also involved. If you're going to read, read. Don't skip around words. I can – I'm following along here, and I see you're sort of skipping around. Sorry, Your Honor. I'm having trouble following. Later on, when all those problems started, that incident with my son-in-law, and now I know that my late son-in-law was also involved. At least I know he provided certain services to the front, the Belarusian front. And now – and for doing this, he was quite well paid. And this ties back into her earlier testimony about the fact that he was – Your earlier statement was she testified that her son-in-law told her that's who he was working for. And that's what I asked you to find in the record. Okay. Were you able to find that? No, I don't think there's anything to that fact. Other than that, I don't want you to point – Does she say that he got killed as part of his work for the front? She testified that he left to go to work, and then he was killed. She doesn't specifically say that, you know, he was working for the front, and, you know, while he was – you know, while he was punched in, he was killed. Okay. Do you have anything else? The only other thing I'd like to say, Your Honor, is that I don't think that the findings about the credibility are sustainable. The government's points about the fact that if they really wanted to find out what, you know, her husband was up to, they would bang on the door. It just doesn't mesh with the record. She testified that she didn't know the government came back later. And there's also the fact that – Do you still have the administrative record there?  Do you still have the administrative record there? Yes, I do. Flip to page 113 and start looking at page – line 10. I think it's Vladimir's – start with line 9. Vladimir is her son-in-law, right? Mm-hmm. And I said, I said, Vladimir, so where are you going? I guess she's saying where are you going. Yes. What are you supposed to do? He answered, I would just have to escort certain people during their trips, for he was a master of sports and wrestling. He was great at wrestling. Question, Ms. Rykova, do you know which people he was escorting? Answer, I don't know, sir. Well, she actually seems to say she doesn't even know that the people she's escorting are – I mean, he doesn't know anything about them. Well – They are – they are – they are front people or what? Well, I think you can interpret that in two ways, Your Honor. First, I think you can say that, like you said, she doesn't know if they're front people. I think the other alternative is that she's saying, I don't know who those particular people are. I think that's more consistent with her later testimony. I see. He doesn't know the specific individuals. Exactly. Okay. Okay. That's a good answer. Thank you, Your Honor. Thank you. The case was argued with extensive minutes.
judges: Canby, Kozinski, Rawlinson